**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
_____

VERONICA GARCIA, JANE DOE, HUI QUIN LIU,
MARCELA HERNANDEZ, and
ALLIANCE FOR FAMILIES WITH DEVELOPMENTAL NEEDS,

*Plaintiffs*,

v.

**COMPLAINT AND
JURY DEMAND**

RICHARD A. CARRANZA, as the Chancellor of the          Civ. No. 19-3342
New York City Schools of the New York City
Department of Education; the New York City
Department of Education; and the City of New York,

*Defendants*

_____

Plaintiffs Veronica Garcia, Jane Doe,[1] Hui Qin Liu, and Marcela Hernandez ("together, the Individual Plaintiffs") and Alliance for Families with Developmental Need, ("AFDN") hereby alleges the following:

**PRELIMINARY STATEMENT**

1.      This lawsuit challenges the systemic and longstanding failure of the New York City Department of Education ("NYCDOE") to provide Limited English Proficient[2] ("LEP")

---

[1]      Ms. Doe is a survivor of gender-based violence. She currently resides in a homeless shelter. She, and her children, previously lived in a domestic violence shelter. She is referred to as Jane Doe in order to preserve her privacy.

[2]      "Limited English Proficient" is the terminology used in both the Elementary and Secondary Education Act, § 9101(2015) and the Individuals with Disabilities Education Act, 20 U.S.C. § 1401(2010). The term "English Language Learner" ("ELL") is now preferred for students, but the term LEP remains applicable to parents in the context of identifying and addressing language barriers to ensure parent participation. The term "native language," when used with respect to an individual who is Limited English Proficient, means the language normally used by the individual or, in the case of a child, the language normally used by the parents of the child. 20 U.S.C. § 1401(2010).

parents of New York City public school students with the opportunity to participate fully and meaningfully in their children's educations.

2.      The Individual Plaintiffs in this action are LEP parents of children with severe developmental disabilities, and they work tirelessly to advocate for their children's right to a meaningful education in NYCDOE schools. Their efforts are frustrated by Defendants' deliberate failure to implement policies and procedures necessary to afford Plaintiffs access to interpretation and translation in their native languages. By their actions, Defendants have engaged in a pattern and practice of failing to provide interpretation and translation that violates Title VI of the Civil Rights Act, its New York City equivalents, and the Equal Educational Opportunities Act.

3.      Defendants' failure to provide language access also deprives Plaintiffs of their rights under the Individuals with Disabilities Education Act ("IDEA") to participate in the formulation of their children's special education programs.  As a result, the Individual Plaintiff's children were denied critical services, and support, necessary to help them make educational progress.

4.      Plaintiffs bring this action to enforce their rights pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*; IDEA, 20 U.S.C. § 1401 *et seq.*; Equal Educational Opportunities Act, 20 U.S.C. § 1701 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*, to be free from discrimination on the basis of national origin, to secure language access, and to participate fully in their children's educations.

**JURISDICTION AND VENUE**

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §
1331. Supplemental jurisdiction over Plaintiffs' New York City law claims is proper under 28
U.S.C. § 1367.

6.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in this District because some of
Plaintiffs' claims arose in the Eastern District of New York, Defendants administer public
schools in this District, and many of Defendants' actions and omissions complained of occurred
in this District.

**PARTIES**

7.      Plaintiff Veronica Garcia is the mother of S.G.,[3] an eight-year old student in the
New York City public school system.  S.G. attends P37R in Staten Island, New York. She is a
child with a disability defined by the IDEA. Ms. Garcia  primarily speaks, reads, and writes in
Spanish.

8.      Plaintiff Jane Doe is the mother of A.C., an eight-year old student in the New
York City public school system.  A.C. attends PS M811 in New York, New York. He  is a child
with a disability defined by the IDEA.  Ms. Doe primarily speaks, reads, and writes in Mandarin
Chinese. Ms. Doe is a member of the AFDN.

9.      Plaintiff Hui Qin Liu is the mother of S.C., an eight-year student in the New York
City public school system.   S.C. attends P277Q at P.S. 76 in Queens, New York. She  is a child
with a disability defined by the IDEA. Ms. Liu primarily speaks, reads, and writes in Mandarin
Chinese. Ms. Liu is a member of the AFDN.

---

[3]  The minor children of the Individual Plaintiffs named here will be referred to by initials to protect their privacy.

10.     Plaintiff Marcela Hernandez is the mother of A.H, a seventeen-year old student in the New York City public school system. A.H. attends P721 in Staten Island, New York. She is a child with a disability defined by the IDEA. Ms. Hernandez primarily speaks, reads, and writes in Spanish.

11.     Plaintiff AFDN is a 501(c)(3) non-profit membership-based community organization headquartered in Queens, New York. AFDN serves the needs of LEP parents who have children with developmental disabilities.

12.     Defendant Richard A. Carranza is the Chancellor of NYCDOE and is responsible for its operations.  Mr. Carranza was appointed by New York City Mayor Bill de Blasio and assumed office on April 2, 2018.

13.     Defendant NYCDOE is responsible for operating New York City's public schools, which are attended by approximately 1.1 million New York City school children. Defendant NYCDOE maintains its principal place of business at 52 Chambers Street, New York, New York.

14.     Defendant NYDOE is the local educational agency within the meaning of the IDEA.

15.     Defendant NYCDOE receives hundreds of millions of dollars in federal funds each year, making it a program in receipt of federal funds within the meaning of Title VI of the Civil Rights Act of 1964.

16.     Defendant City of New York is a municipality within New York State and maintains the offices of its Corporation Counsel at 100 Church Street, New York.

## STATUTORY AND REGULATORY FRAMEWORK

**Title VI of the Civil Rights Act of 1964**

17.     Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d *et seq.* ("Title VI"), provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."

18.     The Office for Civil Rights ("OCR") at the United States Department of Education ("USDOE") and the Civil Rights Division of the United States Department of Justice ("USDOJ") share authority for enforcing Title VI in the education context.

19.     The USDOJ which oversees enforcement of and compliance with Title VI by recipients of federal funds, issued a *Guidance for Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons*, 67 F.R. 41455 (June 18, 2002), which states that "Under DOJ regulations implementing Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*, (Title VI), recipients of Federal financial assistance have a responsibility to ensure meaningful access to their programs and activities by persons with limited English proficiency."

20.     A January 7, 2015 "Dear Colleague" letter written jointly by the USDOE's Assistant Secretary for Civil Rights and the USDOJ Acting Assistant Attorney General for Civil Rights provided guidance concerning the importance of providing access to LEP parents of public school children, stating:

> School districts and SEA [State Educational Agencies] have an obligation to ensure meaningful communication with LEP parents in a language they can understand and to adequately notify LEP parents of information about any program, service, or activity of a school district or SEA that is called to the attention of non-LEP parents. At the school and district levels, this essential information includes but is not limited to information regarding … special education and related services, IEP meetings, … student discipline

5

policies and procedures, … report cards, requests for parent permission for student participation in district or school activities, parent-teacher conferences, parent handbooks, … and any other school and program choice options.

…SEAs and school districts must provide language assistance to LEP parents effectively with appropriate, competent staff – or appropriate and competent outside resources. It is not sufficient for the staff to merely be bilingual. … School districts should ensure that interpreters and translators have knowledge in both languages of any specialized terms or concepts to be used in the communication at issue. [4]

21.     The USDOJ and USDOE Dear Colleague Letter further notes that "translations that are inaccurate are inconsistent with the school district's obligation to communicate effectively with LEP parents," cautions "against the use of web-based automated translations." It also notes that "to ensure that essential information has been accurately translated and conveys the meaning of the source document, the school district would need to have a machine translation reviewed, and edited as needed, by an individual qualified to do so."[5]

22.     The letter also states that school districts must provide language access to LEP parents with "appropriate, competent staff or appropriate and competent outside resources."[6] It is not sufficient to use bilingual staff. The school district should ensure that interpreters are competent to translate in and out of English and that interpreter and translators are trained on the role of interpreter and translator, the ethics of interpretation and translation and the need to maintain confidentiality. [7]

---

[4]     USDOJ and USDOE "Dear Colleague" letter dated January 7, 2015 and attached guidance (2015), available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-el-201501.pdf (last accessed May 28, 2019).

[5]     *Id.*

[6]     *Id.*

[7]     *Id.*

**Individuals with Disabilities Education Act ("IDEA")**

23.     The IDEA, 20 U.S.C. §1400 *et seq*., governs how states and localities provide early intervention, special education, and related services to children with disabilities and  is designed "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs…"[8]

24.     The IDEA defines "free and appropriate education" ("FAPE") as: "special education and related services that (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this title."[9]

25.     School districts are required to prepare an Individualized Education Program ("IEP") for each student covered by the IDEA.  An IEP is a statement of, among other things, the student's level of academic attainment, goals for the student's academic progress, a description of the student's progress towards those goals, and a statement of the special education and related services, accommodations, and modifications that will be provided to the student.[10] The services and modifications provided the student must be contemplated to ensure that the student

---

[8]     20 U.S.C. §1400(d)(1)(A).

[9]     20 U.S.C. §1401(9).

[10]     20 U.S.C. §1414(d)(1)(A).

is able "to advance appropriately toward attaining...annual goals" and "to be involved in and make progress in the general education curriculum."[11]

26.     The IDEA requires that educational decisions about a child's evaluation, educational program, and school placement be made through the IEP team meeting with the parent's meaningful involvement.[12] An IEP meeting must occur, at minimum, once a year.[13]

27.     The IDEA expressly includes certain procedural safeguards, requirements, and school district duties to ensure meaningful parental participation, notification, and consent throughout the special education process, including protections for parents whose native language is not English.[14]

28.     School districts like NYCDOE, as the local educational agency, must obtain informed written parental consent in order to authorize and conduct an initial evaluation of a student and the initial provision of special education services. Parental consent is required to continue to provide special education services and re-evaluations. Parental consent means the parent has been "fully informed of all information relevant to the activity for which consent is sought, in his or her native language, or through other mode of communication" and that the parent "understands and agrees" in writing to the carrying out of the activity for which his or her consent is sought. [15]

---

[11]     20 U.S.C. § 1414(d)(1)(A)(i)(IV).

[12]     20 U.S.C. § 1415; *see also* 34 C.F.R. § 300.327.

[13]     20 USC §1414 (d)(2)(A); 20 USC §1414(d)(4)(A)(i).

[14]     20 U.S.C. §§ 1400, 1412(a), 1414, 1415; *see also* 34 C.F.R. Part 300. 34.

[15]     20 U.S.C. § 1414(a)(l)(D); 34 C.F.R. § 300.9 (*emphasis added*).

29.     The NYCDOE must take "whatever action is necessary to ensure that the parent understands the proceedings of the IEP team meeting, including arranging for an interpreter at the IEP team meeting for parents with deafness or whose native language is other than English."[16]

30.     The IDEA also requires that parents of a child with a disability receive Prior Written Notice within a reasonable time before the public agency (1) proposes to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child; or (2) refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child.[17] Such required Prior Written Notices must be (1) written in language understandable to the general public; and (2) "provided in the native language of the parent or other mode of communication used by the parent, unless it is clearly not feasible to do so."[18]

31.     In addition to notifying parents of the IEP meeting to ensure they are able to attend, local educational agencies such as NYCDOE are required by the IDEA to provide the parents with information that will be discussed at the meeting, *e.g.,* evaluations; tell them if the IEP meeting has a particular purpose or objective, such as the addition of a new service, and to tell them who will participating in the meeting.[19]

32.     The NYCDOE must give the parent a copy of the child's IEP at no cost to the

---

[16]     34 C.F.R. § 300.322(e) (emphasis added); *see also* 23 Ill. Admin. 226.530. 36.

[17]     20 U.S.C. § 1415(b)(3).

[18]     34 C.F.R. § 300.503(c) (*emphasis added*).

[19]     20 U.S.C. §§ 1400, 1412(a), 1414, 1415; *see also* 34 C.F.R. §§ 300.321, 300.327, 300.501(c).

parent.[20]   If changes are made to the IEP, the parent must upon request be provided with a revised copy of the IEP with the amendments incorporated.[21]

33.     The IDEA also provides due process protections for students with disabilities. Parents of students with disabilities may request an administrative due process hearing regarding the identification, evaluation or educational placement of a student with a disability, or to the provision of a free and appropriate public education to the student.[22]   A hearing officer presides over the administrative due process hearing. The hearing officer is empowered to award remedies for the denial of FAPE to individual students.

34.     Under the IDEA, impartial hearing officers do not have jurisdiction to address deprivations of *parents*' rights, or to order school districts to create or implement across-the-board policies or practices.

**Equal Educational Opportunities Act (EEOA)**

35.     Section 1703(f) of the Equal Educational Opportunities Act ("EEOA"), 20 U.S.C. §1701 expressly prohibits state and local educational agencies from denying "equal educational opportunity to an individual on account of his or her…national origin" by failing to take "appropriate action to overcome language barriers that impede equal participation by students in instructional programs."[23]

**New York City Human Rights Law**

36.  Pursuant to the NYCHRL, it is an unlawful discriminatory practice for any person, being

---

[20]   20 U.S.C. §1414(d)(l)(B)(i); 34 C.F.R. § 300.322.

[21]   20 U.S.C. §1414(d)(3)(F).

[22]   20 U.S.C. §1415.

[23]    20 U.S.C. § 1703(f).

the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation because of the actual or perceived . . .  national origin directly or indirectly to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . . ."[24]

37.     A private cause of action for violations of the NYCHRL is created by the Administrative Code of the City of New York § 8-502.

38.     The Administrative Code of the City of New York § 8-130 states that the NYCHRL should be construed "liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title have been so construed."

**Executive Order 120**

39.     In July 2008, New York City Mayor Michael Bloomberg issued Executive Order 120 ("EO 120"), "Citywide Policy on Language Access to Ensure the Effective Delivery of City Services." The EO 120 requires that each New York City agency designate a Language Access Coordinator, develop an appropriate language access policy and implementation plan, and provide language services based on at least the top six languages spoken by the population of New York City.[25]

**NYCDOE Chancellor's Regulation A-663**

40.     NYCDOE Chancellor's Regulation A-663 establishes the procedure for ensuring

---

[24]     Administrative Code of the City of New York §8-107(4)(a).

[25]     The City of New York Office of the Mayor, Executive Order No.120 (2008), available at http://www.nyc.gov/html/om/pdf/2008/pr282-08_eo_120.pdf  (last visited May 7, 2019).

that LEP parents have opportunity for meaningful participation regarding programs and services for their child's education. "Schools shall provide parents whose primary language is a covered language with a translation of any document that contains individual, student-specific information regarding, but not limited to, a student's health, safety, legal or disciplinary matters; and entitlement to public education or placement in any Special Education, English Language Learner or non-standard academic program." [26]

41.    A student's IEP, as detailed in the IDEA, contains student-specific information and information related to the student's entitlement to public education.

## STATEMENT OF FACTS

**Common Facts**

42.    Individual Plaintiffs are all LEP parents of children enrolled in and attending NYCDOE schools administered by Defendants. Their children are attending schools in the District 75 program, which is made up of fifty-seven schools that each provide highly specialized instructional support for children with significant developmental disabilities including, but not limited to, autism, emotional disturbance, significant cognitive delay, sensory impairments and multiple disabilities.

43.    At the beginning of every school year, NYCDOE public schools send home a "blue card" to be filled out by parents to inform school staff what language the child speaks at home.[27]

---

[26] Covered languages mean the nine most common primary languages other than English spoken by persons living in New York City as identified by the Department of Education." NYC Chancellor's Regulations A-6663(i)(A). These languages are Arabic, Bengali, Chinese, French, Haitian Creole, Korean, Russian, Spanish and Urdu

[27]    New York City Department of Education, Regulation of the Chancellor A-663 (June 26, 2009), available https://www.schools.nyc.gov/docs/default-source/default-document-library/a-663-english; (last visited May 28,

44.     Parents also receive a home language survey when they first enroll their children to determine the child's primary language and the language spoken in the home.[28]

45.     For each year that Individual Plaintiffs' children have been enrolled in NYCDOE schools, they have filled out this card, putting each school that their children attend, or have attended, on notice that they are LEP and of the language that is spoken in their homes.

46.     Despite knowledge of the Individual Plaintiffs' LEP status, NYCDOE has consistently engaged in a pattern and practice of failing to provide these parents with the interpretation and translation services they need to be able to participate in their children's educations in a manner equal to their English proficient counterparts.

47.     On information and belief, Defendants have failed to provide training to a significant portion of educators and administrators in their schools to instruct them that they are required provide translation and interpretation services to parents and how to do so.

48.     When Defendants' schools have called Individual Plaintiffs to pick up their children from school because of a child's sudden illness  the schools have regularly spoken to Individual Plaintiffs in English without the use of an interpreter, resulting in Individual Plaintiffs not understanding that their children were ill or why they needed to be picked up from school. When Individual Plaintiffs' children have been injured while attending school, in some instances as the result of peer bullying, Plaintiffs have been denied information in their native languages and as a result have been unable to understand and effectively advocate for their children's needs in school.

_____

2019); *see also* New York City Department of Education, https://www.schools.nyc.gov/multilingual-learners/process/english-language-learners (last visited May 28, 2019).

[28]     *Id.*

49.     Defendants have also failed to provide Individual Plaintiffs with translated notices regarding parent-teacher conferences and other school-related activities, depriving them of an equal opportunity to participate in children's education and in school activities.

50.     When a child has disabilities and needs disability-related educational services, the IDEA makes clear that the school and the child's parents will collectively devise an IEP each year, which will lay out the child's educational needs and the services to be provided.

51.     The IDEA sets forth clear procedural requirements related to the IEP in order to ensure that parents have a full and fair opportunity to have input in to the IEP process, to understand the school's assessment of their children's needs, and to understand the educational services the school plans to provide their children.

52.     Among these procedural requirements, the IDEA requires schools educating disabled children to:

    a.   Hold an IEP meeting with the disabled child's parents at least once per year;[29]

    b.   Send parents a "Prior Written Notice" informing the parent of the date and time of the IEP meeting;[30]

---

[29]    20 USC §1414 (d)(2)(A); 20 USC §1414(d)(4)(A)(i).

[30]    20 USC § 1415(b)(3); 34 CFR §300.503(c).

14

    c.  Send parents a "Second Prior Written Notice," to be sent after the IEP meeting, summarizing the decisions made during the IEP meeting;[31] and

    d.  Provide parents with a copy of the full written IEP once it is finalized.[32]

53.    The notices are vital to a parent's ability to participate in the IEP process.

54.    Attending and understanding IEP meetings is crucial for parents to be able to fully and equally participate in their children's educations.

55.    Defendants have failed to provide Individual Plaintiffs with translated notices regarding IEP meetings.

56.    Some of the Individual Plaintiffs were not provided any interpretation services during the IEP meeting while others were offered interpretation by unqualified and untrained personnel.

57.    The Individual Plaintiffs who received interpretation services during their IEP meetings were unable to understand much of what was happening during the meeting due to Defendants' failure to properly train their employees on how to provide language services and/or use an interpreter.

58.    NYCDOE has no policy or practice to provide interpreters with relevant records prior to the IEP meeting to familiarize the interpreters with the documents that will be discussed at the IEP meeting.

59.    Some schools provided telephonic interpretation to Individual Plaintiffs during IEP meetings. However, school employees nevertheless failed to read aloud the contents of written documents so that the telephone interpreter could interpret them for the parent. Thus, the

---

[31]    20 USC §1415(c); 34 CFR §300.503(c).

[32]    34 CFR §300.322(f).

15

contents of all documents discussed – including draft IEPs – were not conveyed to the Individual Plaintiffs in these situations. As a result, Individual Plaintiffs were deprived of an equal opportunity to participate in decisions concerning their disabled children's educational needs.

60. Moreover, *none* of the Individual Plaintiffs received a translated copy of Progress Reports, Behavioral Intervention Plans, Functional Behavior Assessments, Psycho-educational Evaluation, or other educational assessments used in developing their child's IEPs, all of which are documents vital to a parent's ability to understand and participate in their child's education.

61. Because the Defendants routinely failed to provide Individual Plaintiffs with a translated copy of their children's final IEPs, and because Individual Plaintiffs never received translated copies of educational assessments used in developing the IEPS, Individual Plaintiffs had to rely on their memories of whatever they understood during the IEP meeting as their only record of the meeting or its outcome.

62. Defendants have a contract with a telephone interpretation service, Language Line, which provides on-demand telephonic interpretation services in over 180 languages, including Spanish, Cantonese, and Mandarin.[33]   Upon information and belief, Defendants provide each school with a line item for language services in their budgets. School staff told some of the Individual Plaintiffs that when that money is exhausted, Plaintiffs can no longer receive interpretation and translation.[34]

---

[33]   New York City Department of Education,  https://www.schools.nyc.gov/school-life/policies-for-all/language-access-policy (last visited May 28, 2019).

[34]   A breakdown for each school budget can be found on https://www.schools.nyc.gov/about-us/funding/funding-our-schools. The Fair Student Funding Overview contains a line for translation within its budget allocation. For example, a search for the budget of PS 76 for the 2017-2018 year indicated that $1,258 was allocated for translation.

63.     On information and belief, NYCDOE has no policy or practice to determine the competence of NYCDOE personnel who serve as interpreters at IEP meetings and other special education meetings. NYCDOE does not conduct any vetting to determine whether interpreters, including those provided using the Language Line phone service, are proficient in their ability interpret; have knowledge of the specialized terms and vocabulary used at IEP meetings; and understand/adhere to their roles as interpreters without deviating to another role.

64.     Upon information and belief, NYCDOE personnel who intermittently serve as interpreters for LEP parents in IEP meetings do not follow the basic standards and ethical expectations of professional interpretation. For example, in Individual Plaintiffs' experience: reports are summarized rather than provided in full; reports are not translated or explained to the parent; conversations between school staff at the IEP meetings as well as conversations between staff and the interpreters are wholly omitted from interpretation; parents' statements are not interpreted fully or accurately; and technical vocabulary related to special education law and the relevant disabilities is not interpreted or understood by these interpreters.; and/or interpreters provided by phone access do not interpret or accurately convey important information.

65.     Defendants have been on notice of their system-wide language access failures since at least 2012, when two non-profit advocacy organizations, New York Lawyers for the Public Interest (NYLPI) and Advocates for Children (AFC), filed a complaint on behalf of "the tens of thousands of LEP parents of children with disabilities" with the U.S. Department of Education's Office of Civil Rights.[35]

---

[35]     New York Lawyers For The Public Interest, Inc., New York City Department of Education's Systematic Denial of Language Services to Limited English Proficient Parents of Children with Special Needs letter dated June 20, 2012 (2012), available at www.advocatesforchildren.org/sites/default/files/on_page/evc%20ocr%20complaint.pdf  (last visited May 28,2019).

66.    The NYLPI/AFC complaint noted that "we have repeatedly found that limited English proficient (LEP) parents encounter language barriers that do not allow them full access to documents and meetings related to their children's special education."[36]

67.    In 2014, NYLPI and AFC again wrote to the U.S. Department of Education's Office of Civil Rights, noting continued failures to provide language services to LEP parents of children with disabilities.[37]

68.    Despite Defendants' awareness of the ongoing and systemic failure to provide LEP parents with equal access to school services and participation in their children's education, these failures continue.

69.    In September 2018, NYCDOE announced a pilot program in just three of NYCDOE's thirty-seven[38] school districts to translate IEPs for some parents.[39]

70.    The pilot requires that parents seeking a translated IEP must fill out an online request form. Therefore, this pilot program is inaccessible to parents who are not computer literate enough to fill out an online form.

71.    This pilot does nothing to provide LEP parents with the information they need prior to the IEP meeting in order to effectively advocate for their children's needs.

---

[36]    *Id.*

[37]    New York Lawyers For The Public Interest, Inc., New York City Department of Education's Continued Systematic Denial of Language Services to Limited English Proficient Parents of Children with Special Needs, OCR Case No. 02-12-1269 letter dated December 16, 2014 (2014), available at www.nylpi.org/wp-content/uploads/2014/12/OCR-Case-No-02-12-1269-Supplemental-Letter-12-16-14.pdf  (last visited May 28, 2019).

[38]    There are thirty-two geographic districts and five administrative districts in NYCDOE. This pilot program covers only one administrative district (District 75) and two geographic districts (District 9 in the South Bronx and District 24 in Queens.)

[39]    New York City Department of Education, https://www.schools.nyc.gov/iephello (last visited May 7, 2019).

72.     It does not provide translation for the Prior Written Notice, or any evaluation, progress report, or assessment that a parent would need to review prior to the IEP meeting. In short, the pilot program does little to remedy the DOE's systemic failure to provide translated documents to LEP parents.

**Plaintiffs' Experiences**

*Veronica Garcia*

73.     Veronica Garcia is the mother of S.G., an eight-year-old non-verbal female student with autism. S.G. qualifies for special education under the disability classification of autism. At all relevant times, S.G. has attended NYCDOE schools.

74.     S.G. is currently attending P37R, a District 75 school.

75.     Ms. Garcia is a native Spanish speaker and is LEP. She primarily reads, speaks, and writes in Spanish.

76.     NYCDOE has been on notice that Ms. Garcia is LEP because she repeatedly filled out the blue card that indicated Spanish was the language spoken in her home. Yet, S.G.'s school consistently sent notices such as those informing her parents about flu shots, shortened schools days, and lead testing of water in schools to Ms. Garcia in English. S.G.'s school also consistently failed to provide interpretation for phone calls to Ms. Garcia.

77.     S.G.'s IEP includes nursing services because she suffers from asthma that requires monitoring. During the 2017-2018 school year, Ms. Garcia received multiple emergency phone calls from the school nurse regarding S.G., but every call was only in English.

78.     When she asked school staff why they were not calling her in Spanish, they told Ms. Garcia that the nurse does not speak Spanish and does not know how to use the telephone interpreter.

79.     On March 27, 2018, school staff called Ms. Garcia and told her that S.G. needed to be picked up from school. Ms. Garcia went to the school to get S.G., and on the way home, she discovered that S.G. had a cracked front tooth and a dark bruise on her head. When she confronted school staff about these injuries, and why she hadn't been informed, they gave her conflicting reports about what had occurred. One teacher told her, in English, that S.G's injury was self-inflicted while another told her, also in English, that S.G. had physically pushed herself into a teacher, causing the injury. They did not discuss the nature of the incident in Spanish, or provide her with a written report in Spanish.

80.     The March 27, 2018 incident was not an isolated occurrence. S.G.'s school failing to  disclose that S.G. was injured at school or provide detailed information to Ms. Garcia about the nature of the injuries.

81.     During the 2017-2018 school year, S.G. came home on a near weekly basis with bruises on her arms, shoulders, and back. Following each incident, Ms. Garcia sent a note to the school, in Spanish, to inquire about how S.G. had been injured. The school repeatedly disregarded her requests for information.

82.     When Ms. Garcia confronted school officials in person about the injuries and her belief that S.G. was being bullied by other students, the school staff responded in English and told her that S.G's injuries were self-inflicted. The school also failed to provide Ms. Garcia with complete incident reports following each incident, and the ones provided were only in English.

83.     S.G. requires the use of assistive technology, a device which functions like a large iPad and translates images to speech to help her communicate in school.  During the 2017-2018 school year, S.G.'s assistive technology device stopped functioning. Ms. Garcia spent six months asking the school to repair or replace the device. Ms. Garcia wrote notes in Spanish asking the

20

school to replace the device, but each time she either received no response or was informed in English that the device was "in the shop."

84.     S.G.'s academic ability declined and her behavior in school began to deteriorate dramatically throughout the 2017-2018 school year. Ms. Garcia regularly received phone calls and written notes in English about S.G.'s academic and emotional issues from academic staff and related services providers. During each phone call she received from the school, Ms. Garcia stated in Spanish, "I do not understand English. Please use an interpreter. Please call in Spanish." The school staff always continued speaking in English and then ended the phone call without any input from Ms. Garcia. When Ms. Garcia wrote letters to the school, she wrote them in Spanish and always included the phrases "please respond in Spanish," "I don't understand English," or "I speak Spanish." Nevertheless, the school always responded in English.

85.     Prior to the 2018-2019 IEP meeting for S.G., Ms. Garcia did not receive Prior Written Notice of the date and time in Spanish and school officials at P37R did not provide Ms. Garcia with vital IEP-related documents translated into Spanish.

86.     Prior to the 2018-2019 IEP meeting, school staff at P37R informed Ms. Garcia that interpretation services were not available and that Ms. Garcia would have to provide an interpreter. School staff suggested that Ms. Garcia bring her sixteen-year old nephew to interpret at the meeting.

87.     During the 2018-2019 IEP meeting, school staff kept asking Ms. Garcia's nephew, who had accompanied Ms. Garcia for support, to interpret for them.  Ms. Garcia objected and the IEP team eventually relented and utilized telephonic interpretation.

88.     The telephonic interpreter did not have any of S.G.'s IEPs, progress reports, or evaluations, and was not able to effectively communicate staff input or parent questions. Prior to

21

the end of the meeting, the phone line disconnected and the IEP team refused to utilize another interpreter for the remainder of the meeting.

89.     During this meeting, Ms. Garcia requested translated copies of the provider reports, functional behavior assessment, and IEP. The IEP team stated that they did not have the ability to fulfill this request. Six months after the IEP meeting, Ms. Garcia received a translated IEP; however, she has never received any translations of S.G.'s evaluations.

90.     The persistent failure of the NYCDOE to provide adequate language assistance services to Ms. Garcia has resulted in substantial injury to Ms. Garcia. She has been unable to understand the recommendations provided in the IEPs, unable to make informed decisions, and unable to meaningfully participate in her daughter's education.

91.     She has also suffered emotional distress and embarrassment from not knowing where her child's injuries come from, her inability to understand what is happening to her child at school, and the dismissive and unhelpful behavior by school staff.

92.     The acts, conduct, and behavior of Defendants caused Ms. Garcia to suffer actual damages including, but not limited to, inconvenience, insult, mental distress, embarrassment, and a denial of access to educational benefit for her child, and other economic or non-economic damages.

*Jane Doe*

93.     Jane Doe is the mother of A.C., an eight-year-old male autistic student with severely limited verbal capacity. A.C. qualifies for special education under the disability classification of autism. At all relevant times, S.C. has attended NYCDOE schools.

94.     A.C. is currently attending P811M, a school in the District 75 program.

95.     Ms. Doe is a native Chinese speaker and is LEP. She reads and writes Simplified Chinese, and primarily speaks Mandarin.  Ms. Doe understands a limited amount of English.

96.     NYCDOE has been on notice that Ms. Doe is LEP because she filled out the blue card that indicated Mandarin was the language spoken in her home. Yet, A.C.'s current and former schools have consistently sent school notices and letters in English to the home.

97.     Until the 2016-2017 school year, A.C. attended PS 244Q. Prior to the 2015-2016 IEP meeting that was conducted at PS 244Q, NYCDOE was on notice that Ms. Doe is LEP, that she could not read English, and that she required documents to be translated into Chinese.

98.     Prior to the 2015-2016 IEP meeting, school staff at PS 244Q did not provide Ms. Doe with vital IEP related documents translated into Chinese. Additionally, the 2015-2016 IEP was not translated for Ms. Doe.

99.     A.C. started attending P.S. 9 during the 2016-2017 school year. P.S. 9 was on notice that Ms. Doe is LEP and required Mandarin interpretation, and yet the school sent notices and letters to Ms. Doe in English.

100.    Ms. Doe requested that her phone conversations with the school regarding the education, health, and wellbeing of A.C. include a Mandarin interpreter. Despite her requests, school staff at P.S. 9 regularly called Ms. Doe and spoke only in English, without a Mandarin interpreter.

101.    While attending P.S. 9, A.C. was the victim of repeated and persistent bullying that included physical assaults by other students. On at least four to five occasions, A.C. came home from school with open wounds and/or bruises on his face, back, arms, and/or legs.

102.    When Ms. Doe called the school to discuss this issue, they refused to provide her with an interpreter and would not speak with her on the phone. When Ms. Doe went to the school in person to ask about these incidents, school staff asked a teacher who spoke limited Mandarin to translate; however, as a result of inadequate translation, Ms. Doe was not able to fully understand how her son was injured, who else was involved in these incidents, and what steps the school was taking to ensure that they did not continue. She was not informed of her right to ask a written report or investigation into these injuries or advised as to what safety measures, if any, could be taken to help A.C.

103.    On several occasions during the 2017-2018 school year, the school nurse at P.S. 9 called Ms. Doe to report—in English—that A.C. had been injured in school.

104.    During one incident, school staff at P.S. 9's apologized to Ms. Doe over the phone and said that no Mandarin interpreter was available. The staff member added that "since we all live in the United States," Ms. Doe should learn English. School staff at P.S. 9 also failed to provide Ms. Doe with language services in conjunction with  A.C.'s IEP meetings.

105.    Prior to the 2016-2017 IEP meeting, P.S. 9 failed to provide Ms. Doe with a Prior Written Notice of the date and time for the meeting in any language and as a result, she did not attend. The IEP was completed without her participation.

106.    Defendants did not translate the 2016-2017 IEP for Ms. Doe.

107.    Ms. Doe received notice of the 2017-2018 IEP meeting in English and attended that meeting.  A phone interpreter was provided for the meeting.

108.    Prior to that meeting, however, school staff at P.S. 9 did not provide Ms. Doe with vital IEP-related documents translated into Chinese.

24

109.    The phone interpretation at the 2017-2018 IEP meeting was inadequate because the interpreter did not have any of A.C.'s IEPs, progress reports, or evaluations, and therefore was not able to provide meaningful interpretation regarding those documents.  Ms. Doe was unable to effectively communicate with other members of the IEP team to ask questions or receive and convey information because of this insufficient interpretation at the meeting.

110.    The 2017-2018 IEP was not translated for Ms. Doe.[40]

111.    In January 2019, A.C. transferred from P.S. 9 to P811M, where he is currently attending school.

112.    Ms. Doe filled out a blue card which indicated that Mandarin Chinese was the language spoken in the home. Yet P.S. M811 has regularly sent written notices to Ms. Doe in English.

113.    When school staff at P811M have called Ms. Doe, the conversations have regularly been conducted in English.  Each time, Ms. Doe has requested a Mandarin interpreter, and each time the staff at P811M have told her they cannot find a Mandarin interpreter and have told her they will speak to her slowly in English.

114.    During the current school year, the nurse at PS811M called Ms. Doe to tell her that A.C. was sick. The nurse put A.C. on the phone and asked him to tell his mother that he had a fever and needed to be picked up from school. Other times, the nurse has called Ms. Doe and spoken to her in English, loudly and slowly, in an attempt to facilitate her comprehension.

115.    As a result of the persistent failure of the staff at A.C.'s school to provide written translation and oral interpretation services in Chinese, Ms. Doe has been unable to understand

---

[40]    Ms. Doe has been involved in an administrative hearing to challenge the failure of NYC DOE to provide appropriate special education services to A.C. The hearing officer in that matter issued an order to have the 2017-2018 IEP translated. This order did not extend to future IEPS.

the recommendations provided in the IEPs, unable to make informed decisions, and unable to meaningfully participate in her son's education.

116.    She has also suffered emotional distress and embarrassment from the dismissive and unhelpful behavior by school staff and the school's refusal to use an interpreter when calling her, which inhibits her ability to understand what is happening to her child at school.

117.    The acts, conduct, and behavior of Defendants caused Ms. Doe to suffer actual damages including, but not limited to, inconvenience, insult, mental distress, embarrassment, and a denial of access to educational benefit for their children, and other economic or non-economic damages.

### Hui Qin Liu

118.    Ms. Liu is the mother of S.C**.,** an eight-year-old nonverbal female student.  S.C. qualifies for special education under the disability classification of autism. At all relevant times, S.C. has attended NYCDOE schools.

119.    S.C. is currently attending P277Q at P.S. 315, a school in District 75.

120.    Ms. Liu is a native Chinese speaker and is LEP. She reads and writes Simplified Chinese, and primarily speaks Mandarin. She understands a limited amount of English.

121.    The NYCDOE has been on notice that Ms. Liu is LEP because she filled out the blue card that indicated Mandarin is the language spoken in her home. And yet, staff at P277Q regularly sent school notices such as those for parent teacher conference to Ms. Liu in English.

122.    On several occasions during the 2017-2018 and 2018-2019 school year, staff at S.C.'s school have called Ms. Liu and started speaking in English. On these occasions, she has requested a Chinese interpreter and the staff member has hung up the phone.

26

123.    S.C. suffers from seizures and has had several episodes at school and on the school bus. S.C.'s teachers have been notified that the duration and severity of S.C.'s seizures is important information for her medical care and that this information needs to be gathered and provided to Ms. Liu each time S.C. has a seizure.

124.    On numerous occasions when S.C. has had a seizure, either in school or on the bus, school staff at P277Q called Ms. Liu to tell her but have only spoken to her in English without an interpreter. During one incident, S.C. seizure was so severe that it required sending her to a hospital by ambulance. The bus driver who called Ms. Liu only spoke English when she informed Ms. Liu that S.C. had been sent to the emergency room. Ms. Liu was able to understand the name of the hospital and used that to decipher that S.C. had had a seizure.

125.    S.C. has, on at least two occasions, come home with bruises and bite marks on her body. Following each incident, Ms. Liu sent a note to the school, written in English with the help of a friend, to inquire about the details of the injuries. The school staff responded with a phone call, in English, to tell her that the incidents were being investigated. The school failed to provide any explanation in Chinese as to the nature of the incidents. The school also failed to provide Ms. Liu with complete incident reports following each incident.

126.    The school has also failed to provide Ms. Liu with language services in conjunction with  S.C.'s IEP meetings.

127.     Prior to the 2016-2017 IEP meeting, school officials at P277Q were on notice that Ms. Liu  is LEP, that she cannot read English, and that an interpreter was necessary for her to meaningfully participate in the IEP meeting.

128.    On April 6, 2016, Ms. Liu attended an IEP meeting for the 2016-2017 school year, during which the school provided a phone interpreter. NYCDOE did not provide Ms. Liu with vital IEP-related documents translated into Chinese prior to the meeting.

129.    The phone interpretation for the meeting was inadequate because the interpreter did not have any of S.C.'s IEPs, progress reports, or evaluations, and therefore was not able to provide meaningful interpretation regarding those documents. Because of the insufficient interpretation at the meeting, as Ms. Liu was unable to effectively communicate with other members of the IEP team to ask questions or receive and convey information.

130.    S.C.'s IEP for the 2016-2017 school year was not translated for Ms. Liu.

131.    The following year, for the 2017-2018 school year, Ms. Liu attended the IEP meeting during which the school again provided a phone interpreter. Again, school staff at P277Q did not provide Mr. Liu with vital IEP-related documents translated into Chinese prior to the meeting.

132.    The phone interpretation for the meeting was inadequate because the interpreter did not have any of S.C.'s IEPs, progress reports, or evaluations, and therefore was not able to provide meaningful interpretation regarding those documents. Because of the insufficient interpretation at the meeting, Ms. Liu was unable to effectively communicate with other members of the IEP team to ask questions or receive and convey information.

133.    S.C.'s IEP for the 2017-2018 school year was not translated for Ms. Liu.

134.    On April 30, 2018, Ms. Liu attended the IEP meeting for the 2018-2019 school year. The school staff at P277Q provided a phone interpreter. Once again, school staff did not provide Ms. Liu with vital IEP related documents translated into Chinese

135.    The phone interpretation was again inadequate because the interpreter did not have any of S.C.'s IEPS, progress reports, or evaluations, and therefore was not able to provide meaningful input regarding those documents.

136.    Ms. Liu has also been deprived of the opportunity to meaningfully participate in S.C.'s education in other ways. Ms. Liu requested that S.C. receive feeding therapy and increased physical therapy as related services to her daughter's IEP.   Due to inadequate translation and interpretation, the school failed to follow up on the request for feeding therapy, and decreased, rather than increased S.C.'s physical therapy. Ms. Liu was not provided with an explanation for why her request for feeding therapy was refused, nor was she informed that she had the right to challenge the school's refusal to assess the needs to obtain these services for her child.

137.    As a result of the persistent failure of S.C.'s school to provide written translation and oral interpretation services in Chinese, Ms. Liu has been unable to understand the recommendations provided in the IEPs, unable to make informed decisions, and unable to meaningfully participate in her daughter's education.

138.    The acts, conduct, and behavior of Defendants caused Ms. Liu to suffer actual damages including, but not limited to, inconvenience, insult, mental distress, embarrassment, and a denial of access to educational benefit for her child, and other economic or non-economic damages.

***Marcela Hernandez***

139.    Marcela Hernandez is the mother of A.H. A.H is a seventeen year old female student with very limited verbal abilities.   A.H. qualifies for special education under the disability of autism.

140.     At all relevant times, A.H. has attended NYCDOE schools. She is currently attending P721, a District 75 school.

141.     Ms. Hernandez is a native Spanish speaker and is LEP. She primarily speaks, reads and writes in Spanish. Ms. Hernandez has been enrolled in English as a second language courses and has made gains in her English language skills. She can engage in conversational English, but she does not possess the capacity or vocabulary to effectively communicate regarding, and advocate, for special education services for her daughter.

142.     NYCDOE has been on notice that Ms. Hernandez is LEP because she regularly filled out the blue card that indicated Spanish is the language spoken in her home. And yet A.H.'s school consistently sent notices, including information about flu shots, the high levels of lead in the water in schools in Staten Island, and those informing parents of half days at school to Ms. Hernandez in English. A.H's school also consistently failed to provide interpretation for phone calls to Ms. Hernandez.

143.     When A.H. has gotten sick at school, Ms. Hernandez has received notes, in English, that say A.H. was not feeling well on a particular day. She has never received these notices in Spanish.

144.     On one occasion when Ms. Hernandez was at the school, she asked if there was a Spanish interpreter available to help her for a meeting, and a staff member responded to her "why don't you learn English?" On other occasions when Ms. Hernandez has called the school and asked for an interpreter, she has been told by school staff to "just try to tell me in English."

145.     Ms. Hernandez sought assistance from Staten Island Legal Services ("SILS") to help advocate for A.H.'s education needs. Prior to A.H.'s 2018-2019 IEP meeting, a social worker at SILS requested a Spanish interpreter for the IEP meeting.

146.    On the afternoon of June 12, 2018, Ms. Hernandez received a Prior Written Notice for an IEP meeting that was scheduled for that same date in the morning. The notice was in English and there was no Spanish translation accompanying it. Ms. Hernandez understood that there was a date and time for a meeting but did not understand the nature of the meeting.  She contacted her SILS advocate who informed her that the notice was for an IEP meeting.

147.    On the morning of June 12, 2018, before Ms. Hernandez had received the Prior Written Notice, school staff at P721 conducted the IEP meeting without Ms. Hernandez' participation. The IEP team made no effort to reschedule the meeting or ensure that notice of the meeting had been provided in Spanish.

148.    At the conclusion of the meeting, the IEP team called Ms. Hernandez, and, in English, informed her that the IEP had been completed. Ms. Hernandez asked for an interpreter and was told that no one was available at the time.

149.    Ms. Hernandez immediately contacted her SILS advocate upon learning that the IEP meeting had been conducted without her participation. The advocate requested that the IEP meeting be reconvened.

150.    Ms. Hernandez received a Prior Written Notice, in Spanish, for the rescheduled IEP meeting. The notice was dated September 24, 2017, but it indicated that the IEP meeting was scheduled for June 19, 2018. Ms. Hernandez was confused by the notice, and contacted her advocate for clarification, and learned that the school had used an old date when translating the Prior Written Notice.

151.    Prior to the rescheduled 2018-2019 IEP meeting, school staff did not provide Ms. Hernandez with vital IEP-related documents translated into Spanish.

31

152.   Prior to the June 19, 2018 IEP meeting, Ms. Hernandez' advocate again requested interpretation for the meeting; however, school staff failed to arrange for a qualified interpreter, and instead asked a paraprofessional to interpret during the meeting.

153.   The paraprofessional was fluent in Italian and understood some Spanish. She was not a trained interpreter, did not review A.H.'s IEP, progress reports or evaluations prior to the meeting, and was only present for a portion of the meeting. She did not try to interpret for all staff members at this meeting, but only tried to interpret when Ms. Hernandez spoke. Given the limited Spanish speaking abilities of the paraprofessional, the interpretation was incomplete and inadequate. School staff requested the meeting be expedited so the paraprofessional could return to her job duties.

154.   Ms. Hernandez was unable to effectively communicate with other members of the IEP team to ask questions or receive and convey information about A.H.

155.   During the June 19, 2018 meeting, Ms. Hernandez again requested that an interpreter be used for all communications with her moving forward and also requested translated copies of all IEP related documents. She specifically requested translated copies of A.H.'s psych-educational report and IEP. The IEP team told Ms. Hernandez that there was no need for her to receive a translated IEP. The IEP team claimed that translating it would be a tremendous inconvenience and that a translation could take "many, many months" to obtain. It took nearly six months of requests by Ms. Hernandez's advocate for her to obtain a translated IEP. The translated IEP consisted of the first three pages in Spanish, with the goals section of the IEP in English. Ms. Hernandez was not provided any translated evaluations.

156.   Ms. Hernandez continues to receive all documents from the school in English.

157. Prior to the 2019-2020 IEP meeting, school staff did not provide Ms. Hernandez with vital IEP-related documents translated into Spanish. Prior to the meeting, Ms. Hernandez' advocate again requested interpretation for the meeting; however, school staff told her that Ms. Hernandez should bring her own interpreter.

158. On May 13, 2019, Ms. Hernandez and her advocate attended the IEP meeting. They were offered a phone interpreter; however, the advocate insisted that an interpreter be provided because the phone interpreter would not have any of A.H.'s IEPs, progress reports, or evaluations, and would not be able to provide meaningful interpretation regarding those documents as part of the IEP process. The IEP team ultimately provided a staff member to interpret; however, the interpreter was not competent as she was unable to translate key phrases that were being addressed at the meeting. Without a competent interpreter, Ms. Hernandez found it very difficult to communicate, and could not convey important information

159. At the conclusion of the meeting, Ms. Hernandez was given a form in English and told to sign it. The form indicated that A.H. would not be receiving a diploma. Ms. Hernandez did not understand the form. A copy of the form was not provided in Spanish nor was it translated for Ms. Hernandez.

160. On May 13, 2019, Ms. Hernandez' advocate received a copy of A.H.'s IEP in English with a note that said they would attempt to translate it into Spanish but had no time frame for how long the process would take to provide the translation.

161. As a result of the failure of Ms. Hernandez' school to provide written translation and oral interpretation services in Spanish, Ms. Hernandez has been unable to understand the recommendations provided in the IEPs, unable to make informed decisions, and unable to meaningfully participate in her daughter's education.

162.    She has also suffered emotional distress and embarrassment from the dismissive and unhelpful behavior by school staff and the school's refusal to use an interpreter when calling her, which inhibits her ability to understand what is happening to her child at school.

163.    The acts, conduct, and behavior of Defendants caused Ms. Hernandez to suffer actual damages including, but not limited to, inconvenience, insult, mental distress, embarrassment, and a denial of access to educational benefit for her child, and other economic or non-economic damages.

*Alliance for Families with Developmental Needs, Inc.*

164.    AFDN is a 501(c)(3) not-for-profit corporation founded in 2016. Its headquarters is located in Queens, New York. AFDN has approximately 400 members who participate in-person at AFDN's events or participate electronically through AFDN's information-sharing, online network. Approximately seventy percent of AFDN's members are LEP.  All, or nearly all, of AFDN's members also have one or more children with developmental disabilities.

165.    AFDN's mission is to inform, educate, and assist its members in overcoming barriers that can arise due to their limited English language proficiency and the developmental disabilities of their children.

166.    Most of AFDN's members are native speakers of Mandarin, Cantonese, or other Asian languages.

167.    The majority of AFDN's members have children who are attending schools in the New York City public school system.

168.    Plaintiffs Liu and Doe  are members of the AFDN.

169.    AFDN conducts informational workshops in its members' native languages to educate its members about IEPs and the New York City public school system.

34

170.    AFDN estimates that over 75% of its members have unsuccessfully asked for a New York City public school to translate a document related to their child's education into their native language.

171.    AFDN serves as an advocate for parents seeking education-related services for their children. In doing this work, AFDN expends resources on interpreting and translating for parents because Defendants fail to provide interpreters and translations.

172.    As a result of Defendants' persistent failure to provide translation and interpretation, AFDN has had to divert its resources to help its members with language access rather than acting as parents' advocates on substantive educational matters.

173.    Defendants' failure has harmed AFDN members by depriving them of their right to participate meaningfully in their children's education and development.

## CAUSES OF ACTION

### COUNT I:

**Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.***

174.    Plaintiffs incorporate each and every paragraph above as though fully set forth herein.

175.    Defendants operate programs in receipt of federal funds and are thus covered by Title VI's prohibition on national origin discrimination.

176.    Defendants have violated Title VI's prohibition on national origin discrimination by failing to take reasonable steps to provide meaningful access to their services for Individual Plaintiffs and AFDN members, the LEP parents of children attending Defendants' schools.

177.    Defendants have failed to provide Individual Plaintiffs and AFDN members with access to the school's services, including services related to their children's disabilities, and

35

services unrelated to their children's disabilities, including information concerning parent teacher conferences, school breaks, and health related notices.

178.   Defendants have failed to provide their schools with sufficient training and funding to allow even the most willing school to provide meaningful access to their services for LEP parents.

179.   Defendants have failed to establish policies and practices that guarantee LEP parents the language services they need to meaningfully participate in their children's educations.

180.   Defendants have been on notice since at least 2012 of its widespread and systematic policy and practice of failing to provide meaningful access to LEP parents.

181.   Despite being on notice of these failures, Defendants have not taken meaningful steps to correct the problem and have continued to act intentionally and with deliberate indifference to the continued exclusion of LEP parents from Defendants' services.

182.   Defendants' pilot project – undertaken *six years* after a federal Office of Civil Rights Complaint was filed against Defendants on this very issue – requires parents to affirmatively request a translated IEP through a website. The pilot's scope is limited to only three school districts, and exclusively to translated IEPs – and does not address the issue of what should happen for parents who do not have access to the internet.

183.   Each school attended by the Individuals Plaintiffs' children has been put on notice that each and every Individual Plaintiff is LEP and requires language services.

184.   These schools have continued to fail to provide such services to parents, in many instances literally speaking over them in English as they are requesting an interpreter.

185.    School staff have also made comments and engaged in behavior that evinces national origin discrimination, including speaking loudly to LEP parents as though they are hard of hearing, telling parents that they should learn English "since we all live in the United States," or asking parents why they haven't learned English.

186.    Defendants' practices fly in the face of Federal and City regulations requiring translations, as well as a City Executive Order requiring Defendants to provide interpreters to LEP individuals and to provide translations of "vital documents."

187.    Similarly-situated parents who were born and raised in the United States and whose primary language is English are not excluded in this way from participation in Defendants' services or in decisions about their children's education.

188.    Defendants' have acted intentionally and with deliberate indifference to the fact that LEP parents are being excluded from participation in Defendants' services or in decisions concerning their children's education.

189.    This pattern and practice of failing to provide language services to LEP parents constitutes intentional national origin discrimination, within the meaning of Title VI.

190.    Plaintiffs have suffered damages including but not limited to emotional distress in an amount to be determined at trial.

## **COUNT II:**

**Violation of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.***

191.    Plaintiffs repeat and re-allege each and every allegation above as if set forth fully herein.

37

192.     The Individuals with Disabilities Education Act requires Defendants to allow the parents of disabled schoolchildren to meaningfully participate in decisions concerning their child's education.

193.     Defendants' failure to provide language services to Individual Plaintiffs and AFDN members has violated their right to meaningfully participate in decisions concerning their child's education.

194.     Defendants have violated the procedures set forth in the IDEA by consistently failing to provide Individual Plaintiffs and AFDN members with an adequate opportunity to participate in the development of their children's IEPs, by failing to provide adequate translation and interpretation services.

195.     Defendants do not provide LEP parents legally mandated written information regarding their children with a disability's education translated into the LEP parents' native languages. Without timely and complete written translations of vital IEP process documents, these LEP parents cannot participate in the educational placement decisions, as they are entitled to under IDEA.

196.      On-the-fly oral interpretations of these vital IEP process documents during IEP meetings are not an adequate substitute for timely receipt of completely translated vital IEP process documents as required by IDEA.

197.     Defendants' acts and omissions are systemic in nature and are not capable of redress through an impartial hearing.

198.     Hearing officers under the IDEA do not have jurisdiction to order Defendants to create remedies for violation of parents' rights to language access or to implement the across-the-board policies and practices needed to redress Defendants' legal violations.

199.     Defendants have violated the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* (the "IDEA").

## COUNT III:

### Violation of the Equal Educational Opportunities Act, 20 U.S.C. §§ 1701-1758

200.     Plaintiffs repeat and re-allege each and every allegation above as if set forth fully herein.

201.     The Equal Educational Opportunities Act ("EEOA") provides that "[n]o State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by…the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs." 20 U.S.C. § 1703(f).

202.     By denying Individual Plaintiffs and AFDN members language access services, Defendants have failed to take appropriate action to overcome language barriers that impede their children's participation in Defendant's instructional programs in violation of the EEOA.

203.     Plaintiffs have suffered damages including, but not limited to, emotional distress in an amount to be determined at trial.

204.     AFDN has suffered financial harm by the diversion of its resources to enforce its members' rights.

## COUNT VI:

### Violation of the New York City Human Rights Law, N.Y.C. Code § 8-107

205.     Plaintiffs repeat and re-allege each and every allegation above as if set forth fully herein.

206.     Defendants have engaged in an unlawful discriminatory practice in violation of

the New York City Human Rights Law, N.Y.C. Code § 8-107 (the "New York City Human Rights Law").

207.    Defendants have discriminated against Individual Plaintiffs and AFDN members' on the basis of race and national origin by denying them the right to the full and equal enjoyment, on equal terms and conditions, of the accommodations, advantages, services, facilities or privileges of the NYC school system on behalf of their children. NYC Admin. Code § 8-107 (4) (a)(1)(a).

208.    Plaintiffs have suffered damages including but not limited to emotional distress in an amount to be determined at trial.

## JURY DEMAND

209.    Plaintiffs demand a trial by jury on all issues pursuant to the Seventh Amendment to the U.S. Constitution and Rule 38 of the Federal Rules of Civil Procedure.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court for the following relief:

1.    Declare that Defendants have violated Title VI by intentionally discriminating against Individual Plaintiffs and AFDN members;

2.    Declare that Defendants have violated the IDEA by failing to provide Individual Plaintiffs and AFDN members with an adequate and meaningful opportunity to participate in the development of their children's IEPs and education;

3.    Declare that Defendants have violated the EEOA by failing to take proper action to overcome language barriers that impede the educational progress of the Individual Plaintiffs' and AFDN members' children;

4.    Declare that Defendants have violated the New York City Human Rights Law;

5.      Order Defendants to notify all LEP parents at the beginning of every school year, in the most common languages in New York City, that parents can obtain free interpretation to communicate with school personnel and free translation of IEPs, IEP-related notices, and other vital documents;

6.      Order Defendants to provide to all LEP parents free interpretation to communicate with school personnel and free translation of IEPs, IEP-related notices, and other vital documents;

7.      Order Defendants to implement policies, practices, and training programs for all teachers, staff, and school officials on the obligation to provide interpretation and translation to all LEP parents.

8.      Order Defendants to create and track a complaint system for LEP parents denied language services, and to provide notice to all LEP parents;

9.      Award Plaintiffs damages in an amount to be determined at trial;

10.     Award Plaintiffs attorneys' fees and costs; and

11.     Grant any and all such other relief as this Court may deem just and proper.

Dated: June 5, 2019

Respectfully submitted,

By:_____*/s/ AL*_____

Legal Services NYC
40 Worth Street, Suite 606
New York, NY 10013
Telephone: 347-592-2198
Amy Leipziger, Esq.
M'ral Broodie-Stewart, Esq.
Veronica Cook, Esq.
Edward Josephson, Esq.
Christopher Lamb, Esq.
*Counsel for Plaintiffs*

41